JOHN CONN, APPELLEE, v. ITL, INC., A NEBRASKA
CORPORATION, ET AL., APPELLANTS.

187 N. W. 2d 641

Filed June 11, 1971. No. 37778.

Holtorf, Hansen, Kortum & Kovarik and David C. Nuttleman, for appellants.

Orie C. Adcock, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SMITH, J.

The Workmen's Compensation Court dividing on rehearing decided that a myocardial infarction suffered by plaintiff was compensable notwithstanding preexistence of a sclerotic coronary artery. It found total disability from June 18, 1968, to January 13, 1970, and for an indefinite future time. On appeal the district court affirmed. Plaintiff's employer, ITL, Inc., and its insurer, defendants, appeal. Chief issues concern employment causation and total disability.

On June 17, 1968, plaintiff's duty in defendant's employ was to operate a truck tractor which pulled a semitrailer. Plaintiff also was to distribute the cargo, groceries, at stores of Associated Grocers, "AG," and to help unload the groceries. Age 42, he had been driving

trucks 23 years but only 3 weeks for ITL. That morning he went to an AG warehouse to connect his tractor with a refrigerator semitrailer.

Plaintiff's version of events is as follows: The semi-trailer was dollied too high for its kingpin and the non-hydraulic fifth wheel of the tractor to be coupled. Having moved wooden skids into place to elevate the rear of the tractor, plaintiff backed it on the skids. He still could not connect the kingpin and the fifth wheel. He then stepped out of the tractor to crank the dolly in low gear to lower the semitrailer. To do so he had to reach up. He testified: "I couldn't move it and I was putting all my efforts into it and straining and I still couldn't lower the dollies, so I stopped and rested . . . several times. . . . this is where . . . a terrible pain hit me here in the chest which went down through both arms. I couldn't breathe and I was just in a cold sweat . . . and I . . . slid down . . . in next to the drivers on my tractor . . . ."

Plaintiff in his case-in-chief called two other witnesses. One, a catalog expediter for AG, on cross-examination conceded that plaintiff's cranking had appeared no harder than had been usual. Plaintiff completed the coupling and walked unassisted to the coffee room where he first complained of chest pain. The other witness was spotting trailers for AG. According to him plaintiff was rolling down the dollies with nothing unusual appearing.

Plaintiff was taken to the office of Dr. William Gentry, a physician and surgeon, at Gering. Plaintiff narrated a history of no prior illness related to his present condition, of no prior heart attack. He complained of pain in the left chest radiating into both arms, gas, and fullness in the epigastrium. The pain had begun an hour earlier, and it had not ceased. He had experienced frequent episodes of gas associated with dyspnea the last 6 months. The manager of ITL testified that en route to Dr. Gentry's office plaintiff had admitted suffering chest pains the preceding 2 or 3 days.

Having examined plaintiff and administered demerol, Dr. Gentry ordered him confined in the intensive care unit of the West Nebraska General Hospital. He left an order for covmadin and demerol as they were needed. Among the tests taken were electrocardiograph, blood enzymes, and chest X-ray. Electrocardiograms, "EKGs," were obtained on the 17th, 18th, 19th, and 22nd. Blood enzymes, which were tested on the 17th, 18th, and 21st, were normal. The sedimentation rate, which was taken on the 17th, was normal. The chest was fluoroscoped on the 24th. Early EKGs were normal except a slight peaking of the P wave. Subsequent EKGs disclosed a flattening out of the P wave and a condition within normal limits. Plaintiff was discharged from the hospital on June 24.

In the opinion of Dr. Gentry plaintiff had not suffered a heart attack or myocardial infarction. Dr. Gentry diagnosed gouty arthritis and peptic ulcer. The diagnosis rested on the absence of objective evidence of heart injury, elevation of the uric acid, and X-rays of the "upper G.I. tract."

Following removal of his family to Las Vegas, Nevada, plaintiff joined them about July 5, 1968. His chest pain was continuing. One hospital refused to admit him because he could not pay. The county physician subsequently admitted him to Southern Memorial Hospital in Las Vegas, and Dr. John A. DiFiore began treating plaintiff on July 22.

Dr. DiFiore testified by deposition. An internist, he had specialized in cardiology and treatment of cardiovascular diseases for 23 years. He was Governor for Nevada of the American College of Cardiology. Plaintiff had related these complaints and history: Pain high in the substernal area, and at the root and front of the neck, a condition causing shortness of breath and perspiration; a deep ache in the left arm down into the fingers of the left hand; the injury on June 17, 1968; and the hospitalization.

Dr. DiFiore prescribed an anticoagulant, morphine, demerol, a tranquilizer, potassium iodide, atropine, "A.P.C." tablets, milk of magnesia, and seconal. He ordered these tests: Repeated EKGs, blood enzymes, blood chemistries, prothrombin, Lee-White clotting time, chest X-rays, Panel Ten, blood cholesterol, calcium, thyroid, and on May 27, 1969, a coronary arteriogram.

In the opinion of Dr. DiFiore the EKGs obtained in Nebraska were not within normal limits. He presumed that plaintiff had undergone sclerotic changes in the right coronary artery. The arteriogram, 250 feet long, disclosed only one point of abnormality—an occlusion of the artery. Plaintiff had sustained a myocardial infarction that was atypical and caused by the unusual effort in trying to crank the dolly. Dr. Difiore testified: ". . . on 6/17/68 . . . he suffered his first chest pain, which came from the heart as a result of a disturbance of the blood circulation to the heart muscle, and . . . at that time some muscular damage was most likely incurred . . . .. . . . I determined . . . that this man had suffered an acute myocardial infarction some time between June 17, '68, and his admission to our hospital . . . .. My opinion is that because of the unusual effort . . . on 6/17/68 . . . he suffered acute ischemia to his heart muscle . . ., and because of the ischemia . . ., over a slow process, . . . a myocardial infarction had occurred, all stemming from the unusual effort, again, on 6/17/68." Plaintiff's disability was such that Dr. DiFiore would permit plaintiff to drive a truck but not to lift more than 15 pounds.

Plaintiff was examined on September 9, 1969, at defendants' request by Dr. Otto A. Wurl, who had specialized in cardiology 15 years. Dr. Wurl testified by deposition: Plaintiff had exhibited symptoms of coronary heart disease—atherosclerosis or hardening of the arteries—when the Nebraska hospital had admitted him. Natural progress of the disease process caused the pain plaintiff suffered June 17. A pain may be angina pec-

toris of effort, but an occlusion does not result from any kind of external physical effort. Atherosclerosis ordinarily progresses with age. No evidence of damage to the heart muscle existed on June 17, 1968, and the events that day were not a factor in the subsequent myocardial infarction that plaintiff suffered. Dr. Wurl found plaintiff totally disabled.

Defendants contend that (1) plaintiff in calling the two witnesses vouched for their credibility and (2) their testimony, although it was in conflict with that of plaintiff, bound plaintiff. They cite Lindelow v. Peter Kiewit Sons', Inc., 174 Neb. 1, 115 N. W. 2d 776 (1962); and Bland v. Fox, 172 Neb. 662, 111 N. W. 2d 537 (1961). There are two answers. First, the rule applied only where the contradiction and all other evidence left no question for the trier of fact. Second, a party calling a witness does not vouch for credibility of the witness. See State v. Fronning, 186 Neb. 463, 183 N. W. 2d 920 (1971).

A workmen's compensation claimant, unaided by presumption, bears the burden of proof that his employment in fact caused a compensable injury. See § 48-151 (2), R. R. S. 1943. Such a claimant with atherosclerosis which was a personal risk and a cause of an otherwise compensable injury may recover under these circumstances: An employment risk greater than that of ordinary nonemployment life was a cause of the injury. See Beck v. State, 184 Neb. 477, 168 N. W. 2d 532 (1969).

The evidence supports the finding of permanent disability. See § 48-185, R. R. S. 1943. Plaintiff suffered total disability caused in part by atherosclerosis, a personal risk, and in part by exertion greater than that of ordinary nonemployment life—an employment risk.

The district court allowed plaintiff $500 for services of his counsel. The allowance was not excessive.

The judgment is affirmed. We allow plaintiff $750 for services of his counsel in this court.

AFFIRMED.

Clinton, J., dissenting.

I dissent respectfully.

Under the provisions of the statute, section 48-151, R. R. S. 1943, the plaintiff must prove by the preponderance of the evidence that he suffered an "injury," which means "only violence to the physical structure of the body and such disease * * * as naturally results therefrom." The terms shall not be construed "to include disability * * * due to natural causes but occurring while the employee is at work, nor to mean *an injury, disability* * * * that is the result of a natural progression of any preexisting condition." (Emphasis supplied.)

In this case it seems clear that the injury must necessarily be the coronary infarction. The majority opinion fairly sets forth the medical evidence, which summarized amounts to this: The initial treating doctor's diagnosis was that claimant did not have an occlusion or infarction on the day of the claimed accident. The treating specialist gave as his opinion that the exertions on the day of the incident lead gradually to the infarction. The nontreating expert gave as his opinion that claimant suffered no infarction on the day alleged and the tenor of his testimony is that an occlusion does not result from external physical effort and in this case there was a natural progression of existing disease. Pain such as the claimant described on the day of the incident may be angina pectoris of effort. There was evidence he had symptoms prior to the day in question. It does not seem to me all this constitutes proof by a preponderance of evidence of an injury "in fact caused by the employment."

Under the statute as amended in 1963 the requirement that the injury be caused by accident was eliminated. This eliminated the accident or the substituted "unusual exertion" requirement which used to exist in some cases. Now in heart cases we talk about a concept of "exertion greater than that of ordinary nonemployment life," which seems to be the equivalent of the

old "unusual exertion" concept which is no longer required, and substitute it as proof of "injury."

The majority opinion comes perilously close to making the employer an insurer in any case where symptoms, such as claimant suffered here, coincide with the exertions of his employment greater than his nonemployment life and disability ultimately occurs. See Beck v. State, 184 Neb. 477, 168 N. W. 2d 532.

I agree that the doctors must say whether the exertion has in fact caused the heart attack, the infarction, "the injury." The conflict of the experts, including that of the original treating doctor, is such that it cannot be said that the claimant has proved that his injury was "in fact caused by the employment." There is no question of credibility of the expert witnesses in this case. What we are called upon to do is solely to judge the expertise of the experts. When we have to do that alone there is no proof by a preponderance of the evidence. Where as here the two specialists testified by deposition, the judgment gets down to measuring the length of the respective pedigrees.

The adoption of pragmatic rules such as exertion greater than that of ordinary nonemployment life in order to obviate the problems of medical proof in cases such as this leads, it seems to me, to further complications. In some cases at least we will be called upon to go into the matter of proof of the exertions of nonemployment life in order to make the necessary comparisons. We already have a pragmatic rule, that is burden of proving by a preponderance of the evidence, given us by the provisions of section 48-151, R. R. S. 1943, and that I believe is sufficient.

WHITE, C. J., and NEWTON, J., join in this dissent.